## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

------------------------------------- X

GARY F. PRESTIPINO, on behalf of
himself and all others similarly situated,

           Plaintiff,

   v.

LINCOLN LIFE AND ANNUITY
COMPANY OF NEW YORK,

           Defendant.

------------------------------------- X

CIVIL ACTION NO.


**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff Gary F. Prestipino ("Plaintiff"), by his undersigned attorneys, for his complaint hereby alleges as follows:

### Summary of the Action

1.     Plaintiff, on behalf of himself and all others similarly situated, brings this action ("Action") as a class action individually and on behalf of all other persons and entities who, directly or indirectly, purchased, renewed, or paid premiums on life insurance issued by Lincoln Life and Annuity Company of New York ("Lincoln New York" or "Defendant") within the past six years (the "Class").

2.     Life insurance is essential to the financial security and peace of mind of millions of Americans. Insurance regulators, including New York regulators, require that life insurers establish reserve liabilities ("reserves") for the expected claims for benefits under their life insurance policies and hold strong assets in support of these reserves to ensure that they are able to pay the expected claims.

3.     Because humans cannot forecast the future with perfect accuracy, insurance regulators also require life insurers to maintain a buffer of assets above their expected liabilities, *i.e.* capital, so they are able to pay claims arising from not only expected but also unexpected events—such as the massive, instantaneous loss of life that would take place in a pandemic or a terrorist attack.

4.     In July 2012, the New York State Department of Financial Services ("NYDFS") initiated an investigation into what it called the "shadow insurance" practices of New York-based life insurers, resulting in the issuance of a June 2013 report.  *See generally* "Shining a Light on Shadow Insurance: A Little-Known Loophole That Puts Insurance Policyholders and Taxpayers at Greater Risk," NYDFS, June 2013 ("NYDFS Report"). These practices also received scrutiny in a research paper published by the Federal Reserve Bank of Minneapolis.  *See* Ralph S.J. Koijen & Motohiro Yogo, *Shadow Insurance* (Nov. 2014) ("FRB  Staff  Report"),  *available  at*  https://www.minneapolisfed.org/research/staff-reports/shadow-insurance.

5.     The typical shadow insurance transaction involves the following:   A life insurance company decides (1) that the reserve requirements under New York law are too high and (2) that it has better uses for its assets than supporting large reserves.  For example, rather than preserving assets as required by law to pay life insurance claims, it may use some or all that money to pay its executives higher salaries, to help it purchase other life insurance companies, to pay its stockholders higher dividends, or to invest in riskier securities or other investments.

6.      The life insurance company (often called "the ceding insurer" or "the cedant insurer") then reinsures, or cedes, its risks on a block of life insurance business to an often thinly-capitalized "shell" subsidiary of the life insurance company's corporate parent, called a "captive reinsurer."   The company-affiliated captive reinsurer typically is domiciled in a jurisdiction with lax and opaque regulatory oversight.

7.      Nevertheless, for the ceding insurer to be able to reduce its required reserves, the company-affiliated captive reinsurer usually must post collateral acceptable to the ceding insurer's more stringent regulator.   This often involves the company-affiliated captive reinsurer obtaining a letter of credit ("LOC")—an acceptable type of collateral—from a bank.

8.      The "shadow" in shadow insurance involves the company-affiliated captive reinsurer obtaining that LOC or similar collateral, in whole or in part, based on the financial strength of a more financially secure affiliate within its holding company system—usually its corporate parent company—rather than solely on the basis of the company-affiliated captive reinsurer's own financial strength.   Typically, the parent company of the ceding insurer guarantees the company-affiliated captive reinsurer's obligations to the bank under the LOC (*i.e*, a "parental guarantee").   As the name implies, insurers engaged in shadow insurance provide little or no disclosure of the parental guarantees backing these LOCs.

9.      As a result of these parental guarantees, shadow insurance transactions do not actually result in a complete transfer of the risk from cedant insurance companies.   The risk that the company-affiliated captive reinsurer will be unable to make good on its reinsurance obligations is ultimately funneled back to the cedant insurer's parent by virtue of the parent

company's guarantees in connection with the collateral used to support the shadow insurance transaction.   This "financial alchemy" according to the NYDFS Report, constitutes nothing more than a "shell game[] to hide risk and loosen reserve requirements." NYDFS Report at 1, 4.

10.     Some insurers identified in the NYDFS Report, including Lincoln New York, took shadow insurance a step further by using a practice the NYDFS calls "Two-Step Transactions," which allows New York-based insurers to further conceal the existence of certain shadow insurance practices.  In a Two-Step Transaction, the New York-based insurer cedes risk to a non-New York-based affiliate, which then reinsurers again (or "retrocedes") that risk to a company-affiliated captive reinsurer of the original New York insurer, often collateralizing the retrocession with a parental guarantee—the end result of this complex arrangement is that the New York-based insurer reports no direct transaction between it and a company-affiliated captive reinsurer, despite the presence of the parental guarantee backing the LOC collateralizing the retrocession.  NYDFS Report at 4.

11.     The NYDFS Report explained that Two-Step Transactions are "particularly problematic" because the New York-domiciled insurer "is still ultimately on the hook for losses through a parental guarantee," even though the New York-based insurer reports no direct shadow insurance activity.   *Id.* at 4.   In other words, Two-Step Transactions, "obscure[] the risks that [New York-based] insurers are taking on through shadow insurance." *Id.*

12.     Two-Step Transactions are often used in combination with other troubling shadow insurance practices highlighted in the NYDFS Report.  These practices, which the

NYDFS Reported describes as "present[ing] serious potential risks to policyholders and taxpayers," include "Conditional LOCs" (*i.e.*, LOCs that have stipulated conditions that must be met before they can be drawn upon) and "Hollow Assets" (a practice that allows captive reinsurers to count undrawn LOCs as assets, instead of requiring the captive to hold cash or a bond to satisfy its limited reserve requirements). *Id.* at 4-5. Hollow Assets are particularly problematic for two reasons: (1) this practice increases the likelihood that the captive affiliate will be unable to pay the reinsured claims because it does not have hard assets to pay those claims; and (2) this practice exposes the ceding insurer to the prospect that, at the precise time when it is experiencing financial distress (*i.e.*, when claims on policies are larger than expected), its parent company that is guaranteeing the transaction will also be exposed to financial stress as a result of its guarantee on the LOC.

13. The NYDFS investigation revealed that, by directly using shadow insurance practices, seventeen of New York's eighty life insurance companies, including Lincoln New York, were making their "capital buffers—which serve as shock absorbers against unexpected losses or financial shocks—appear larger and rosier than they actually are." *Id.* at 8. New York-based insurers, through their use of Two-Step Transactions, also made the capital buffers of their non-New York-based affiliates appear larger than they would be absent the use of shadow insurance. The inflated capital buffers reported by the non-New York-based affiliates, in turn, improved the apparent financial strength of the New York insurers' overall holding company. And because rating agencies look at the health of an insurer's holding company when assessing the financial strength of an individual insurer, the

apparent increases in the capital buffers of non-New York-based affiliates inflated the perceived financial strength of the New York-based insurers themselves.

14.    Indeed, the parent companies of New York-based insurers often advertise the financial health of the overall holding company by touting the combined strength of their insurance subsidiaries, including the financial strength of non-New York-based affiliates that increased their capital buffers through the use of Two-Step Transactions.

15.    These misrepresentations, according to the NYDFS Report, "potentially put the stability of the broader financial system at greater risk" and are "reminiscent of certain practices used in the run up to the financial crisis."  *Id.* at 1.

16.    New York Insurance Law Section 4226 provides that no life insurer authorized to conduct business in the state of New York shall "make any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates."  N.Y. Ins. Law § 4226(a)(4).

17.    Section 4226 further provides that any insurer that knowingly violates the statute or knowingly receives any premium or compensation as a result of such violation shall "in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit."  N.Y. Ins. Law §4226(d).

18.    In 1906, the New York Legislature enacted the precursor to present day New York Insurance Law Section 4226 after a lengthy, and now famous, investigation by the Joint Committee of the Senate and Assembly of the State of New York into New York life

insurance companies. This investigation is commonly referred to as the Armstrong Committee Investigation.

19. The New York Legislature initiated the Armstrong Committee Investigation in 1905 in reaction to claims that certain New York-based insurers were wasting corporate assets and using improper accounting techniques. Jerry W. Markham, "A Financial History of the United States" Vol. II 18 (2002).

20. Then, as now, issues surrounding the financial condition of life insurers were of utmost public importance and interest. In fact, the issues were of such public interest that they soon helped catapult the chief investigator of the Armstrong Committee, a middle-aged lawyer named Charles Evans Hughes, into the New York Governor's Mansion. From there, he successively became an Associate Justice of the United States Supreme Court, the Secretary of State of the United States, and the Chief Justice of the United States.

21. The issues remained important for years to come and to this day. In 1939, the New York Legislature amended Section 4226 and gave policyholders a private right of action against offending life insurance companies. Act of June 15, 1939, ch. 882, § 211, 1939 N.Y. Sess. Laws 2530, 2714-15. The amendments stated that an insurer that knowingly violates this section shall be liable "to a penalty in the amount of the sum so received by such violator as such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit, in accordance with the provisions of the civil practice act." *Id.* at 2714-15.

22. From 1939 to the present, the relevant language of New York Insurance Law Section 4226 has remained largely unchanged. The private right of action for the recovery of

premiums paid due to misrepresentation of financial security continues in the law as a deterrent to New York insurance companies that may be tempted to mislead the public regarding their financial security.

23.     Lincoln New York's use of shadow insurance constituted a misrepresentation of the financial condition of Lincoln New York, and the adequacy of the reserves and reserve system upon which Lincoln New York operates.

24.     Plaintiff, as an aggrieved person (a term of common usage referring to persons who fall within the zone of persons protected by the statute), brings this action on behalf of himself and a class of Lincoln New York policyholders seeking a penalty against Lincoln New York in the amount of the premiums they paid for their life insurance policies that were in effect during the Class Period, as provided by New York Insurance Law Section 4226.

## Parties

25.     Plaintiff is a resident and citizen of the state of New Jersey.

26.     In 2003, Plaintiff obtained a Term Life Insurance Policy from Defendant. Plaintiff previously resided in New York, obtained the Term Life Insurance Policy from a New York broker and worked in New York.  Plaintiff paid the premiums on this policy while residing in New Jersey for the past several years.

27.     Plaintiff has made every annual premium payment required under that Policy to date.  Plaintiff's life insurance policy issued by Lincoln New York, thus, remains in effect.

28.     Defendant Lincoln New York is a life insurance company organized and existing under the laws of the state of New York, with its principal place of business in

Syracuse, New York.  Lincoln New York is a wholly-owned subsidiary of Lincoln National Life Insurance Company ("Lincoln National"), an Indiana life insurance company.  Lincoln National is, in turn, a wholly owned subsidiary of Lincoln National Corporation ("LNC"). Lincoln New York and Lincoln National are part of the Lincoln Financial Group.

29.     Lincoln New York is authorized by the State of New York to conduct the business of life insurance in New York.

30.     Lincoln New York is licensed by the State of New Jersey to conduct the business of life insurance in New Jersey.

## Jurisdiction and Venue

31.     This Court has jurisdiction over the subject matter of this Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(A), because (1) the putative class consists of at least hundreds of proposed members; (2) the citizenship of at least one class member (*e.g.*, Plaintiff) is different from Lincoln New York's; and (3) the aggregate amount placed in controversy by the claims of Plaintiff and the putative class members exceeds the sum of $5,000,000 exclusive of interest and costs.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Lincoln New York resides in this District within the meaning of 28 U.S.C. § 1391(c) as Lincoln New York is subject to this Court's personal jurisdiction with respect to this Action.

33.     This Court has personal jurisdiction over Lincoln New York because Lincoln New York engaged in business activities in this District, including sending materials to and receiving several million dollars of premiums each year from policyholders residing in this District such as Plaintiff.

## Background Regarding Life Insurance

34.     Life insurance typically provides money to beneficiaries after a loved-one who has life insurance dies.  The coverage can help pay funeral expenses and estate taxes, replace the decedent's income with a non-taxable death benefit, or more generally reduce the financial burden on the family of the decedent.

35.     Roughly 1,000 insurance companies sell life insurance in the United States, but many are members of groups of insurance companies and do not compete with each other. There are approximately 300 insurance groups in the United States.

36.     Insurance companies within insurance groups are typically connected in ownership and management.  The separate companies in an insurance group facilitate efficiencies in marketing insurance products through different channels, meeting regulatory and licensure requirements of particular states, and/or achieving other organizational goals of the group.[1]

37.     Insurers and their parent companies share strong financial ties, as do the

---

[1] For example, as found by a recent study on capital flows between insurance companies within an insurance group, as individual companies in the group "perform poorly [] for exogenous reasons, internal capital will flow to the [underperforming individual companies]."  *See* Greg Niehaus, *Managing Capital and Insolvency Risk via Internal Capital Market Transactions: The Case of Life Insurers* (June 2014), *available at* http://www.aria.org/Annual_Meeting/2014/2014_Accepted_Papers/6E/Conf%2 0paper%20-%20Niehaus.pdf. Similarly, when individual companies perform well for exogenous reasons, the group's internal capital flows away from the over performing companies.  *Id.*  Thus, insurance groups are able to (and do) allocate capital resources to support the various individual companies.  However, this means that when one insurer within a group performs poorly – such as participating in risky practices that undermine the insurer's solvency – other insurers within the same insurance group are susceptible to financial difficulties and potential solvency issues because their capital may be used to prop up the poorly performing insurer.

captive reinsurers[2] and other operating subsidiaries of the parent.  The result of these close relationships is that the solvency and financial condition of individual operating subsidiary insurance companies is highly correlated to the solvency and financial condition of their parent corporations.

38.    The cost of policies is generally positively correlated with the perceived financial quality of the issuing insurer.

39.    In promoting the financial condition and solvency of an insurance company, insurers such as Lincoln New York frequently refer to and consider ratings for the insurance company assigned by ratings agencies that conduct periodic evaluations of insurance companies.

40.    Four independent agencies – A.M. Best, Fitch, Moody's and Standard & Poor's – rate the financial strength of insurance companies.

41.    Insurers, including Lincoln New York, expect that consumers and group plan purchasers, including Plaintiff, will in some part trust ratings agencies to evaluate the solvency and financial condition of insurers, and to provide important information concerning the likelihood that the insurer could default on its obligations in the future, thus making the insurer incapable of paying promised benefits.

42.    The financial condition of life insurance companies is a particularly important factor insurers like Lincoln New York focus on when marketing their products because life insurance is a long-term product that is not guaranteed by a federal agency such as the

---

[2] As discussed *infra*, captive reinsurers are affiliates of the primary ceding insurer that are specifically formed to provide reinsurance for the primary operating company or companies in an insurance group.  The captives are formed under specific laws enacted in certain jurisdictions.

Federal Deposit Insurance Corporation ("FDIC") which provides guarantees for bank accounts.[3]  Indeed, many life insurance products include long-term contractual guarantees that may be promised for 30, 40 or even 50 years into the future.

43.     Because of the importance of maintaining the solvency of life insurance companies, life insurance, like other forms of insurance, is regulated by state government agencies.  Typically, the insurance regulator in each life insurance company's domicile has the principal role in regulating the company's business.  Thus, in Defendant's case, the NYDFS is principally charged with regulating Defendant's insurance business.

44.     State regulators ensure compliance with various insurance regulations including, without limitation, statutory reserve requirements and risk-based capital ("RBC") requirements.  Insurance regulators, including New York regulators, require that life insurers establish reserves to ensure that they are able to pay the expected claims on the life insurance policies they sell.  Insurers' reserves are usually the primary liabilities on their balance sheets.  Life insurers must hold "admitted assets" in support of these reserves, which are generally high-quality assets that can be reliably liquidated to pay claims.

45.     The reserve requirements issued by state insurance regulators are based on the need to ensure that insurers are able to pay claims on the policies they issue.  The amount of assets that an insurer will ultimately need to pay future policyholders depends on numerous unknown variables, including interest rate changes, mortality rates, and policyholder lapses.

---

[3] Although state guarantee associations provide a partial guarantee of life insurance policies, in the event of an insurer collapse, benefits under existing life insurance policies issued by the collapsed insurer can be cut substantially.  Recently, for example, upon the liquidation of Executive Life Insurance Company of New York, policyholders endured substantial reductions in benefits even after the guarantee associations' contributions.

For these reasons, insurance regulators, including New York regulators, require that life insurers establish reserve liabilities using prescribed formulas that take into account these factors and that include a buffer for the prospect that an insurer's actual experience will be worse than anticipated.

46.     Although reserve requirements are based on an insurer's likely projected risk, plus an additional buffer, they are sufficient to cover only a fraction of an insurer's actual exposure for policyholder claims.  A substantial mortality event, such as the terrorist attacks of September 2001 or a pandemic, or a significant market disruption and loss of asset value, such as the financial crisis of 2008, could easily lead to policyholder claims in excess of the required reserves.  The insurance regulators, including in New York, add buffers to their reserve requirements to cover not only expected losses but also losses that may exceed expectations.

47.     In 2000, the National Association of Insurance Commissioners' ("NAIC") Valuation of Life Insurance Policies Model Regulation, commonly referred to as Regulation XXX, was introduced.  In February 2001, Regulation XXX became effective on a rolling basis in 37 states, including New York.  Regulation XXX imposes conservative assumptions and valuation methodologies for determining the level of statutory reserves, which insurers are required to hold under statutory accounting principles, for term life insurance policies. The conservative assumptions resulted in significantly higher reserve level requirements for life insurance companies than were previously maintained, and limit the financial flexibility of life insurance carriers to use admitted assets for something other than reserves.

48.     Along with Regulation XXX, Actuarial Guideline 38 (commonly referred to as

13

Regulation or Guideline AXXX), promulgated by the NAIC and adopted by numerous states, imposes similar reserve requirements in connection with universal life insurance policies.  Together, Regulations XXX and AXXX impose requirements across the most significant life insurance products.  New York adopted its own version of Regulation AXXX

49.     The effect of both the NAIC and New York versions of Regulations XXX and AXXX is to increase the burdens of maintaining adequate reserves and a strong RBC ratio[4] in jurisdictions that adopted the requirements.

50.     Regulators implement the RBC requirements to provide a capital adequacy standard tied to risk, raise insurers' safety nets, create uniformity among states, and provide regulatory authority for timely action.

51.     The RBC ratio is the prime capital adequacy measure used by regulators in the United States to identify weakly capitalized life insurers.  *See* "The Captive Triangle:  Where Life Insurers' Reserve and Capital Requirements Disappear," Moody's Investor Service (Aug. 23, 2013) ("Moody's Report").  Moreover, ratings agencies also weigh RBC ratios heavily in evaluating insurance companies' financial conditions.

52.     The RBC ratio is thus an important and material factor in the financial health of a life insurance company.

53.     Unfortunately, as discussed herein, the RBC ratio is susceptible to manipulation.  Insurers can boost the ratio by reducing reserve liabilities.  Although such reductions can be accomplished above-board and with regulatory approval through ceding

---

[4] What is commonly referred to as the "RBC ratio" is the ratio of the insurer's total adjusted capital to the minimum amount of capital required under the regulator's formula.  A higher ratio figure is indicative of a more secure institution.

risk to reinsurance companies, many life insurance companies, including Defendant, have artificially reduced their reserve liabilities without regulatory approval through the types of shadow insurance transactions that are at issue in this Complaint.

### Reinsurance in the Life Insurance Industry

54.     "Reinsurance" is a term commonly used to identify a transaction that indemnifies a primary insurer against loss; essentially, it is insurance for the insurer.  In the most widely accepted sense, reinsurance is understood to be the practice where a primary insurer or "ceding insurer," for a definite premium, contracts with another insurer (or insurers) to carry all or part of the risk assumed by the primary insurer in writing the original insurance policy.  The reinsurance contract does not affect the initial obligation between the insured and the primary insurer.  Importantly, the ceding insurer remains obligated to pay policyholder claims in the event that the reinsurer defaults.

55.     "The four basic motives of life and annuity reinsurance are risk transfer, underwriting assistance, capital management, and tax management."  *See* FRB Staff Report at 4.  More generally, reinsurance is used to indemnify and protect the primary insurer against frequent or severe losses.  However, regulations provide that life insurers can reduce their reserve liabilities and avoid dedicating admitted assets for the payment of reinsured policies (a process termed taking a reserve credit for reinsurance) only in certain instances.

56.     Because cedant life insurers are ultimately responsible for paying even reinsured policyholder claims, regulators permit them to take a reserve credit for reinsurance only when the cedant's regulators are confident in the financial ability of a reinsurer to pay

claims when they become due.  Regulators consider two basic categories of reinsurance transactions sufficiently safe to warrant a cedant life insurer taking a reserve credit.

57.    First, regulators allow cedant life insurers to take reserve credit for reinsurance when they secure reinsurance through "authorized reinsurers," which are licensed or accredited by the cedant insurer's regulator.  Because authorized reinsurers are subject to approved enforcement regimes and similar regulatory rules as are ceding insurers, regulators can be confident in their financial strength.

58.    Second, cedant life insurers can take reserve credit for reinsurance from unauthorized reinsurers—which are not subject to direct oversight by the ceding insurer's regulator—in a more limited set of circumstances.  Typically, in order to qualify for a reserve credit, the unauthorized reinsurer must post adequate collateral for its potential obligations. This collateral must amount to 100% of the reinsurer's obligations, and must be in a form that can be easily and reliably collected.  The two most common ways for an unauthorized reinsurer to provide this collateral are (1) for it to maintain a trust with a qualified U.S. financial institution; or (2) for it to secure a clean, irrevocable, and "evergreen"[5] LOC from a US financial institution.

### Captive Reinsurance As A Means For Capital Management

59.    While the principal purpose of reinsurance is to help primary insurers manage their risk capacity, capital management and tax management have recently become increasingly frequent motives for reinsurance transactions.  FRB Staff Report at 4.  There are

---

[5] An "evergreen" LOC has an expiration date but contains a provision – commonly referred to as an "evergreen clause" – that it may be automatically extended (*i.e.*, rolled over) for an indefinite number of periods until the issuing bank informs its beneficiary of the final expiration.

two main reasons for this trend in motivations.  First, the adoption of Regulations XXX and AXXX forced life insurers to hold more capital against their life insurance positions.  Second, certain states – *e.g.*, South Carolina and Vermont – and foreign jurisdictions have adopted new laws allowing life insurers to establish captive reinsurance companies in a manner that effectively circumvents the Regulation XXX and AXXX reserve requirements.  *Id.*

60.     Thus, insurers have, over the last several years, increasingly used reinsurance to maximize the use of their capital (and minimize the amount required to be kept in their reserve).  In theory, a primary/ceding insurer can receive a credit for reserves that the ceding insurer is otherwise required to maintain under Regulations XXX/AXXX provided that the reinsurance transaction meets regulatory requirements.

61.     In many, if not most, cases, affiliated reinsurers are "captive" reinsurers.[6]  In a captive reinsurance transaction, as with other reinsurance transactions, the life insurance company cedes risks and reserves to the captive entity.

62.     In 2002, South Carolina introduced new laws that permitted life insurers to establish captives, whose primary function was to assume reinsurance from affiliated companies for the purpose of reducing overall reserves.  *See id.* at 5.  In 2004, South Carolina introduced the captive structure of the "special purpose financial captive," and Vermont

---

[6] Captive insurance companies are formed under specific laws that prohibit them from issuing policies to individual and group purchasers directly.

followed suit with a similar structure in 2007. *Id.* At least 26 states have adopted a version of a captive laws, eight of which have defined special purpose financial captives.[7] *Id.*

63.     Captive reinsurers provide insurance groups with significant advantages over third-party reinsurers. First, they allow the insurance group to keep the underwriting profits within the group. *Id.* Second, when the captive is set up in a favorable jurisdiction, the captive can hold less capital than required under statutory reserve regimes like Regulations XXX and AXXX. Third, when set up in a favorable jurisdiction, the financial statements of the captive are confidential to the public, rating agencies, and insurance regulators – including the primary cedant insurer's regulator. Fourth, the captive jurisdiction may allow the captive to operate under flexible financial structures that allow them to fund reinsurance transactions through either letters of credit or securitization. *Id.*

64.     Thus, while both captive reinsurers and third-party reinsurers can carry risks ceded to them by primary insurers, captive reinsurers can potentially have a bigger impact on the primary insurer's and the insurance group's bottom line.

---

[7] In contrast to the limited number of states that are competing to attract captive insurance business, several states have examined and rejected the idea. For example, in a December 2013 report, the Maryland Insurance Administration recommended that the state forego captive legislation "because the industry has developed in ways that have caused considerable regulatory concern at the federal and state levels." Maryland Insurance Administration, *Report to Examine Methods to Establish and Properly Regulate a Captive Insurer Industry in the State of Maryland* (Dec. 2013), *available at* http://www.mdinsurance.state.md.us/sa/docs/documents/news-center/legislative-information/captive-report-122013.pdf. "To become a thriving captive domicile today, a state must be willing to relax important regulatory safeguards. Attractive new domiciles are those that have a high risk appetite, demand few hurdles to formation, have low premium taxes and fees, have minimal solvency and capital requirements, and require little in the way of reporting." *Id.*

65.     As described herein, however, many of the "advantages" provided by captive reinsurers are not permitted by the primary insurer's regulator (and for this reason, are concealed from the primary insurer's regulator).

### The NYDFS Investigation and Shadow Insurance

66.     Some insurance companies and their industry lobbies believe that the reserve requirements imposed in connection with life insurance are unreasonably burdensome and unnecessary.

67.     A limited number of insurers have responded to the capital strains imposed by these statutory reserve requirements by ceding risk to offshore captive reinsurers and captive reinsurers domiciled in states with much looser regulations and reporting and reserve requirements through mechanisms designed to circumvent the regulatory requirements in the insurers' home jurisdictions.

68.     To evade the allegedly overly burdensome requirements imposed by the State of New York, Defendant has engaged in reinsurance transactions using collateral that is designed to appear to its regulator and the public as permissible collateral but, in fact, is insufficient to qualify for the reserve credits that it claims.

69.     In July 2012, the NYDFS initiated an investigation into the "shadow insurance" practices of life insurance companies based in New York.  This investigation led to the June 2013 NYDFS Report in which the NYDFS concluded that certain of these life insurers, including Lincoln New York, had used shadow insurance to conceal the true extent of their exposure to the risk of financial loss.

70.     In shadow insurance transactions, life insurers reinsure a subset of their policies with company-affiliated captive reinsurance companies that are unauthorized in the cedant's jurisdiction.

71.     The unauthorized company-affiliated captive reinsurers to which users of shadow insurance cede business are typically based in jurisdictions with reserve and capital requirements that are less strict than those applicable to the cedant insurer.  The cedant insurer finds these jurisdictions advantageous for a number of reasons.  First, most company-affiliated captive reinsurers can use much less conservative accounting rules in calculating their reserve liabilities for ceded business than can a cedant insurer, which must account for those reserves under ordinary insurance regulatory rules, such as those promulgated by the State of New York and its insurance regulators.  Second, company-affiliated captive reinsurers often face relaxed rules about what types of assets they can use to hold against the reserves that they do calculate.  Third, capital rules for company-affiliated captive reinsurers are generally not risk-based, and often require the captive to maintain only a small and fixed level of capital that bears no relationship to the captive's actual risk exposures (and ultimately the policy obligations of the ceding insurer).

72.     After ceding business to a company-affiliated captive reinsurer, users of shadow insurance then take full reinsurance reserve credit for the reinsured policies. Because shadow insurance involves ceding business to an unauthorized company-affiliated captive reinsurer, insurers engaging in this practice must fully collateralize the company-affiliated captive reinsurer's obligations in accordance with various regulatory rules in order to take a reinsurance reserve credit.

73.     Companies using shadow insurance, however, violate the spirit of these collateral rules by backing the LOC serving as collateral for reinsurance transactions (thus permitting the cedant to take a reserve credit) with parental guarantees.

74.     As a result of these parental guarantees, shadow insurance transactions do not result in a complete transfer of the risk from cedant insurance companies.  The risk that the captive will be unable to make good on its reinsurance obligations—a substantial prospect given the lax and opaque regulatory oversight to which it is subject—is ultimately funneled back to the cedant insurer's parent by virtue of the parent company's guarantees in connection with the collateral used to support the shadow insurance transaction.  NYDFS Report at 1-2.

## The Consequences of Parental Guarantees

75.     The NYDFS discovered that many of the parent companies of New York-based insurers that engaged in shadow insurance transactions had not established significant reserves to back the various forms of parental guarantees that they had provided in connection with these transactions.  *Id.* at 22.  Indeed, most had established no reserves whatsoever to back the parental guarantees.  *Id.*

76.     This lack of reserves puts policyholders at grave risk because of the potential unfunded liability that would be incurred by the parent company should a drawdown of the LOC occur.  Such a drawdown could lead to a liquidity crisis within the holding company system, which includes, among other entities, the parent company, the ceding insurer, and the company-affiliated captive reinsurer.

77.     This situation is exacerbated by the strong connection between the financial condition of the parent company and its operating insurance company subsidiaries.  In the event that the parent company's guarantees under an LOC supporting shadow insurance transactions are actually triggered, the parent is likely already to be experiencing independent sources of financial stress.  A parent's guarantee under an LOC will be triggered only if the company-affiliated captive reinsurer is unable to pay the claims it has assumed.  This could be the result of various factors—including poor underwriting of the original claims, substantial changes in mortality experience, or substantial decreases in asset returns—that are likely to diminish financial health across the parent company's insurance operations, including the original cedant.  Thus, the parent's potential exposure on an LOC guarantee in shadow insurance transactions is substantially correlated to its other potential risk exposures.

78.     Accordingly, funneling back to the parent company the risk that the company-affiliated captive reinsurer will be unable to meet its obligations exposes the parent company and the cedant insurer to substantial risks.

79.     One such risk involves the fact that shadow insurance leaves ceding insurers substantially exposed to the risks that they ostensibly reinsured in the shadow insurance transaction.  The financial health of any insurance company is substantially related to the financial health of its parent company.  This is because insurance companies that experience large capital deteriorations but that are part of a strong holding company can reliably expect to receive capital infusions from their parent companies.  *See* Note 1, *supra*.  Indeed, many of the insurance companies that experienced substantial capital strains during the 2008 financial crisis were able to recapitalize themselves relatively quickly because of large capital infusions

from their parent companies.  For this very reason, the health of an insurance company's parent company and holding company system is a material factor that private rating agencies use in assessing a company's financial strength.

80.     Another risk stems from the fact that shadow insurance leaves ceding insurers substantially exposed to the prospect of a sudden balance sheet shock because the bank used to support the shadow insurance transaction could refuse to renew the supporting LOC if it had real, or imagined, concerns about the parent company's financial strength.  Because the cedant insurer and the company-affiliated captive reinsurer have obtained the LOC and the resulting reserve credit on the strength of the parental guarantee, the cedant's reserve funding has become tied to the creditworthiness of the parent company providing that guarantee.

81.     In August 2013, Moody's Investor Service issued a report warning of the dangers of shadow insurance.  *See* Moody's Report.  The Moody's Report concluded that, when an insurer relies upon its holding company to adequately fund its reserves (as when a company-affiliated captive reinsurer uses an LOC backed by a parental guarantee as collateral to support a reinsurance transaction), "[t]his dependency of an insurer on its holding company's creditworthiness could be disastrous in a stressful environment." Moody's Report at 4.

82.     Because the health of an insurer's parent is usually tied to the health of the insurer itself, an insurer that suffered a failure of its reserves due to the failure of a parental guarantee would be unlikely to be able to find other sources of funding for the reserves. Thus a financially troubled insurer would have inadequate funds to pay policyholder

claims—exactly the outcome that the regulatory reserve requirements in New York are designed to prevent.

83.    As a result, shadow insurance transactions ultimately leave the ceding insurer and its policyholders substantially exposed to the very risk that the insurer had ostensibly transferred to the company-affiliated captive reinsurer and on the basis of which it had taken a complete reserve credit.

## Manipulating the Risk-Based Capital Ratio

84.    An insurer's capital is comprised roughly of its total assets minus its total liabilities.  Capital provides policyholders with a number of critical protections.  For instance, it helps ensure that the insurer, rather than its policyholder, bears the initial cost of unanticipated losses, thus providing a buffer against the insurer's insolvency.  Relatedly, it encourages an insurer's owners and management to follow less risky business and investment strategies, because their own money is at risk in the event that those strategies prove unsuccessful.

85.    Regulators require risk-based capital to be determined by a formula that incorporates individualized measures of an insurer's main risk exposures, including its asset risks, interest rate risks, credit risks, and, in the case of life insurers, its projected mortality risks.  An insurer's capital strength is usually expressed as a risk-based capital ratio.  The RBC ratio is determined by dividing an insurer's Total Adjusted Capital (that is, the actual amount of capital and surplus the insurer has, plus other items that the RBC instructions may provide) by its Authorized Control Level Risk-Based Capital (*i.e.*, the minimum amount of capital required under the risk-based capital formula).  As the difference between these

numbers increases, the more secure an insurer appears and the higher its risk-based capital ratio becomes.

86.    An insurance company's RBC information, including its RBC ratio, is a critical measure of the insurer's financial strength.  Insurers know that their financial strength that they promote to the market is a material factor in their ability to successfully market their products to brokers, agents, and consumers interested in purchasing life insurance. Rating agencies, in particular, heavily weight insurers' total risk-based capital levels in assessing insurers' financial strength.  Rating agencies and market participants generally expect life insurers to maintain risk-based capital ratios greater than 700% of their minimum capital requirements (*i.e.*, their authorized control levels).

87.    Because an insurer's RBC ratio depends on its total capital, and its total capital depends on its aggregate assets and liabilities, insurers can boost their RBC ratio and their apparent financial strength by reducing their reserve liabilities.  Because of the reduced reserve liabilities, an insurer's existing level of assets appear to provide policyholders with greater protection against loss than is actually the case.

88.    In its investigation, the NYDFS discovered that New York-based life insurers used the reserves they diverted by engaging in shadow insurance transactions to artificially boost the risk-based capital ratio they reported to regulators, investors, rating agencies, and the general public—without actually raising any new capital or reducing risk.  Thus the insurers' capital buffers, which serve as shock absorbers in the event of unexpected losses, were made to appear larger than they actually are.

89.    The NYDFS investigatory findings are further supported by other sources.

90.     The Moody's Report warned that shadow reinsurance transactions make the risk-based capital ratio, the prime measure of capital adequacy used to identify weakly capitalized life insurers, inaccurate as a measure of true capital adequacy.  Moody's Report at 4.

91.     An article in the *Financial Times* reported that because life insurers "have offloaded" billions of dollars "worth of liabilities to subsidiaries in jurisdictions with weaker reserve rules, . . . policyholders [are exposed] to greater risks equivalent to three notches of an aggregate credit rating across the industry."  Alistair Gray, "Shadow Insurance Schemes Multiply to $360bn," *Financial Times*, Sept. 30, 2013.

92.     The *Financial Times* based its findings on the research of Ralph Koijen, Professor of Finance at London Business School, and Motohiro Yogo of the Federal Reserve Bank of Minneapolis, as discussed in the FRB Staff Report.

93.     Professor Koijen stated that he could see "no obvious rationale" for engaging in shadow insurance "other than to circumvent regulatory requirements."  Professor Koijen and Motohiro Yogo also estimated that the "size of the insurance market would shrink by about a fifth" if shadow insurance practices were eliminated.

94.     Indeed, in the FRB Staff Report, Koijen and Yogo disclosed several important findings concerning shadow insurance.  According to the report, "[t]he potential risk of shadow insurance is difficult to assess because the financial statements of shadow reinsurers are confidential to the public, rating agencies, and even to insurance regulators outside their state of domicile."  FRB Staff Report at 2.  The report endeavored to quantify the financial risk of shadow insurance, and concluded that their adjustments for the effects of shadow

insurance transactions reduced risk-based capital for users of shadow insurance (meaning that the shadow insurance transactions inflated the insurer's risk-based capital) and reduced the financial strength ratings of such insurance companies by three ratings notches on average. *See id.* Furthermore, "[t]he adjusted ratings imply an average 10-year default probability that is 3.5 times higher than that implied by the reported ratings." *Id.* at 2-3.

### Two-Step Transactions and Other Shadow Insurance Practices

95.     The NYDFS uncovered several additional shadow insurance practices that it warned "present serious potential risks to policyholders and taxpayers," in addition to the "typical" shadow insurance transaction described above.  NYDFS Report at 1, 4-5.  These troubling practices include (1) Two-Step Transactions; (2) Conditional LOCs; and (3) the use of Hollow Assets.  *Id.* at 4-5.  The first practice, Two-Step Transactions, involves shadow insurance transactions that are specifically designed to hide their true impact from regulators, rating agencies, and the general public, consistent with broader patterns of inadequate or non-existent disclosure of these practices.  The second practice, Conditional LOCs, involves shadow insurance transactions wherein a non-New York-based affiliate of a New York-domiciled insurer does not comply with New York regulatory rules regarding the quality of collateral that must be provided in order for the cedant insurer to take a reinsurance reserve credit.  The third practice, the use of Hollow Assets, involves shadow insurance transactions in which the company-affiliated captive reinsurer does not maintain high-quality assets to back even the limited reserves that it does establish to pay future claims.

96.     The NYDFS Report (which identified Lincoln New York as "Case 8") revealed that Lincoln New York, Lincoln New York's non-New York-based insurance

affiliates, and Lincoln New York's company-affiliated captive reinsurers utilized each of the above-mentioned practices.

### A.  Two-Step Transactions

97.  Two-Step Transactions are transactions by which New York-based insurers transfer risk to non-New York-based insurers, which then transfer that risk to a company-affiliated captive reinsurer of the original New York insurer.  Two-step transactions can be combined with any of the other shadow insurance practices outlined in the NYDFS Report. Two-Step Transactions, however, are particularly effective for hiding the existence of shadow insurance practices from regulators, rating agencies, and the general public, because there is no direct transaction between the original New York-based insurer and the company-affiliated captive reinsurer.

98.  The NYDFS investigation found that certain New York-based insurers, including Lincoln New York, engaged in Two-Step Transactions in order to conceal their actual level of risk from regulators and from the public.  Some New-York-based insurers, including Lincoln New York, utilized parental guarantees as part of their two-step transactions.

### B.  Conditional Letters of Credit ("Conditional LOCs")

99.  Conditional LOCs are letters of credit that have stipulated conditions that must be met before they can be drawn upon.  Because of these conditions, Conditional LOCs pose a substantial risk of being unavailable to pay policyholder claims during periods of financial stress.

100.    New York does not permit Conditional LOCs to be used as collateral in connection with reinsurance with unauthorized reinsurers where carriers take a complete reinsurance reserve credit.  NYDFS Report at 4; N.Y. Comp. Codes. R. & Regs. tit. 11, § 79.2(b).

101.    The NYDFS investigation found that a number of New York-based insurers, including Lincoln New York, had non-New York affiliates that used Conditional LOCs as collateral, thus allowing those life insurers to take a full reinsurance reserve credit despite New York's prohibition on the use of Conditional LOCs to collateralize reinsurance transactions with unauthorized reinsurers, such as company-affiliated captive reinsurers.

### C.    Hollow Assets

102.    The NYDFS investigation also uncovered shadow insurance transactions between cedant insurers and company-affiliated captive reinsurers wherein a letter of credit with a parental guarantee is recorded as an asset on the financial books of the company-affiliated captive reinsurer.  Such assets are essentially "hollow" because unlike real assets, such as cash or bonds, the availability of that asset to pay policyholder claims during a period of financial stress is entirely dependent on the financial health of the parent, and the holding company system as a whole.

103.    New York does not allow insurers to count undrawn letters of credit as admitted assets, even for company-affiliated captive reinsurers.  NYDFS Report, at 4-5.

104.    Allowing a company-affiliated captive reinsurer to count letters of credit with a parental guarantee as assets on its books exposes the ceding insurer to substantial risk.  First, it increases the likelihood that the captive affiliate will be unable to pay the reinsured

claims because it does not have hard assets to pay those claims.  Second, this practice harms the ceding insurer because it exposes that insurer to the prospect that, at the precise time when it is experiencing financial distress (*i.e.*, when claims on policies are larger than expected), their parent company that is guaranteeing the transaction will also be exposed to financial stress as a result of its guarantee on the letter of credit.

105.    The NYDFS investigation found that a number of company-affiliated captive reinsurers of New York-based insurers, including several of Lincoln New York's captives, reported undrawn letters of credit as assets.

### Lincoln New York Misrepresents Its Financial Condition and Reserve System Through Its Use of Two-Step Transactions and Other Shadow Insurance Practices

106.    Lincoln New York is the life insurer identified in the NYDFS Report as "Case 8."

107.    Lincoln New York engaged in Two-Step Transactions.  NYDFS Report at 7. In Schedule S-Part 3 of its 2011 statutory annual statement, Lincoln New York reported that it ceded $1,674,391,033 worth of risk to its parent, non-New York-based Lincoln National.[8] After assuming the $1.6 billion in risk from Lincoln New York, Lincoln National then retroceded some or all of that risk to various captive reinsurers affiliated with Lincoln New York.

108.    Lincoln National reported in Schedule S-Part 4 of its 2011 statutory annual statement that it used LOCs issued by banks in the amount of $1,841,071,300 to secure

---

[8] Lincoln New York took a reserve credit in the amount of $10,500,763 on account of its reinsurance transactions with Lincoln National.  Lincoln New York purportedly collateralized this transaction with a trust in the amount of $54,237,110, although details concerning the assets held in the trust are not included in Lincoln New York's statutory annual statement.

reinsurance obligations of several company-affiliated captive reinsurers: Lincoln Reinsurance Company of Vermont I, Lincoln Reinsurance Company of Vermont III, Lincoln Reinsurance Company of Vermont IV, and Lincoln National Reinsurance Company (Barbados) Limited (collectively, the "Lincoln Captives").

109.   Lincoln National's LOCs totaling $1,841,071,300 were issued as collateral for reinsurance treaties (a type of reinsurance agreement) and were backed by "contractual parental guarantees."

110.   Nearly the entire amount of the LOCs used by Lincoln National took the form of Conditional LOCs.

111.   The Lincoln Captives domiciled in Vermont then recorded the Conditional LOCs backed by parental guarantees as admitted assets (*i.e.*, "Hollow Assets") on their balance sheets in the amount of $1,840,571,300.

112.   Lincoln National reported in Column 5 of Schedule S-Part 4 of its 2011 statutory annual statement that it took a reserve credit in the amount of $3,031,595,756 on account of its reinsurance transactions with the Lincoln Captives that were collateralized in part with LOCs and Conditional LOCs backed by parental guarantees.

113.   Yet not all of the reserve credit taken with respect to the Lincoln Captives was obtained on the financial strength of the captives.   Rather, it was obtained through undisclosed guarantees from the corporate parent of Lincoln National and Lincoln New York.   Consequently, the aggregate reserve number in the amount of $62,398,978,087 listed on page 3 of Lincoln National's 2011 statutory annual statement is artificially low.   The artificially low aggregate reserve number on page 3, in turn, improved Lincoln National's

risk-based capital information reported in the Five-Year Historical Data section of its statutory annual statement.

114.   Lincoln National, as confirmed by the NYDFS Report, increased its risk-based capital ratio as a result of its use of LOCs in the amount of $1,841,071,300 backed by "contractual parental guarantees." NYDFS Report at 12-14.  That is, the difference between Lincoln National's Total Adjusted Capital of $7,426,784,541 and its Authorized Control Level Risk-Based Capital of $733,568,500 is greater than it would be absent the parental guarantees.  As the difference between these numbers increases, the more financially stable and well-capitalized an insurer appears and the higher its risk-based capital ratio becomes.

115.   Rating agencies often analyze the balance sheet of an insurer's holding company system when determining an insurer's financial strength rating.  The strength of the holding company is in turn based on the financial soundness of its subsidiaries, including its insurance subsidiaries.

116.   Lincoln New York improved its apparent financial strength through its use of Two-Step Transactions by increasing Lincoln National's risk-based capital ratio, which in turn improved the apparent financial strength of the Lincoln holding company system and, as a result, improved the apparent financial strength of Lincoln New York as well.

117.   In addition, Lincoln New York's corporate parent, Lincoln Financial Group, advertises the financial health of the holding company by touting the combined financial strength of its various insurance subsidiaries, including Lincoln New York and Lincoln National.  For example, its website provides that Lincoln National Corporation reported a "total adjusted statutory capital of $8.2 billion" for the second quarter of 2014, a figure

derived by combining the statutory results of Lincoln New York, Lincoln National, and First Penn-Pacific Life Insurance Company, a different entity in the Lincoln holding company. *Key Facts: Quarter Ending June 30, 2014*, Lincoln Fin. Group, *available at* https://fulfillment.lfg.com/CF/LFG/EF/38468/LFG-KEY-FLI002_Z25_VIEW.PDF. Lincoln New York's parent also boasts that "[b]uilding on more than 100 years of expertise and sound risk management, Lincoln Financial today has a strong financial foundation with ample capital and liquidity to cushion the company from further disruptions in the markets." *A Tradition of Strength*, Lincoln Fin. Group, *available at* https://www.lfg.com/LincolnPageServer?LFGPage=/lfg/acc/abt/msg/index.html.

118.   Lincoln New York's use of Two-Step Transactions increased Lincoln National's risk-based capital ratio, which in turn inflated the apparent financial strength of Lincoln New York's parent.  Lincoln New York's parent company advertised these inflated financial figures to consumers through its website.

119.   Lincoln New York, although not reporting any direct activity with the Vermont-domiciled Lincoln Captives, ultimately transferred some or all of the $1.6 billion of risk it ceded to Lincoln National to the Lincoln Captives through its use of Two-Step Transactions.

120.   Lincoln National, in order to complete the Two-Step Transactions, used Conditional LOCs, which may not be used as collateral for reserve credit under New York law.  The Vermont-domiciled Lincoln Captives, upon assuming the retroceded risk from Lincoln National, then counted the Conditional LOCs backed by parental guarantees as admitted assets on their balance sheet—another practice not permitted in New York.

121.     Professor Koijen of the London Business School explained that he could see "no obvious rationale" for shadow insurance arrangements "other than to circumvent regulatory requirements."  Alistair Gray, "Shadow Insurance Schemes Multiply to $360bn," *Financial Times*, Sept. 30, 2013.

122.     And as further explained by the NYDFS Report, Two-Step Transactions are "particularly problematic" because those transactions constitute a "complex shell game [that] obscures the risks that insurers are taking on through shadow insurance."  NYDFS Report at 4.

123.     Lincoln New York, through its use of Two-Step Transactions, utilized shadow insurance practices that violate New York law regarding collateral for reinsurance and, in doing so, increased the apparent financial strength of its balance sheet.

124.     But despite its use of Two-Step Transactions, Lincoln New York reports on its website that:

> Lincoln Life New York . . . is one of less than 10 percent of life/health insurers in the nation licensed in New York State.  New York has a reputation for strict regulation of the insurance industry and protection of policyholders. As a licensed insurer, we adhere to New York's rigorous laws and regulations.

*Welcome to Lincoln Life & Annuity Company of New York*, Lincoln Fin. Group, *available at* https://www.lfg.com/LincolnPageServer?LFGPage=/lfg/llc/prd/all/nyp/index.html.

125.     Lincoln New York provided no disclosure of its Two-Step Transactions with Lincoln National, no disclosure of the Conditional LOCs used by Lincoln National, and no disclosure that certain company-affiliated captive reinsurers recorded Conditional LOCs backed by parental guarantees as admitted assets on the captive's balance sheet in either

Lincoln New York's statutory annual statement, its SEC filings, or its consolidated annual report.

### Lincoln New York Misrepresents Its Financial Condition and Reserve System Through Its Direct Use of Parental Guarantees

126.   Lincoln New York also engaged in direct shadow insurance activity.

127.   In its 2011 statutory annual statement, which it issued on or around February 8, 2012, Lincoln New York reported an LOC in the amount of $70 million issued by a bank[9] to secure the reinsurance obligations of a non-U.S. affiliated captive reinsurer.

128.   Lincoln New York's $70 million LOC was issued as collateral for a reinsurance treaty (a type of reinsurance agreement) and was backed by a "contractual parental guarantee."   Lincoln New York increased its risk-based capital ratio as a result of this treaty.

129.   Lincoln New York reported in Column 5 of Schedule S-Part 4 of its 2011 statutory annual statement that it took a reserve credit in the amount of $58,965,016 on account of its reinsurance transaction with non-U.S. affiliated captive reinsurer Lincoln National Reinsurance Company (Barbados) Limited.

130.   However, not all of the reserve credit taken with respect to Lincoln National Reinsurance Company (Barbados) Limited was obtained on the financial strength of the captive.   Rather, it was obtained through undisclosed guarantees from Lincoln New York's corporate parent.   Consequently, the aggregate reserve number in the amount of $6,510,735,145 listed on page 3 of Lincoln New York's 2011 statutory annual statement is

---

[9] The actual name of the issuing bank of the LOC is not included in Lincoln New York's 2011 statutory annual statement.

artificially low.  The artificially low aggregate reserve number on page 3, in turn, improved Lincoln New York's risk-based capital information reported in the Five-Year Historical Data section of its statutory annual statement.

131.   Lincoln New York, as confirmed by the NYDFS Report, increased its risk-based capital ratio as a result of its use of an LOC in the amount of $70 million backed by a "contractual parental guarantee."  NYDFS Report at 12-14.  That is, the difference between Lincoln New York's Total Adjusted Capital of $614,025,744 and its Authorized Control Level Risk-Based Capital of $58,492,449 is greater than it would be absent the parental guarantees.  As the difference between these numbers increases, the more financially stable and well-capitalized an insurer appears and the higher its risk-based capital ratio becomes.

132.   The actual financial strength of a life insurance company is a material factor in the insurer's ability to market and sell their insurance products.  As a result, life insurance companies prominently advertise information about their financial strength and seek high ratings from respected rating agencies.

133.   Lincoln New York's website provides that:

> At Lincoln Life New York, we have promises to keep and the strength to keep them. And in the judgment of respected, independent ratings firms, we are prepared to keep our word. The high marks we have received from A.M. Best, Fitch, Standard & Poor's and Moody's attest to our claims-paying ability.

*Welcome to Lincoln Life & Annuity Company of New York*, Lincoln Fin. Group, *available at* https://www.lfg.com/LincolnPageServer?LFGPage=/lfg/llc/prd/all/nyp/index.html.

134.   Lincoln New York prominently displays on its website an A.M. Best rating of "A+," a Fitch rating of "A+," a Moody's rating of "A1," and a Standard & Poor's rating of

"AA-."  In the life insurance industry, insurers use these ratings as a way to compete with others to obtain policyholders and their business.

135.    Ratings agencies, however, give considerable weight to risk-based capital ratios when they determine an insurer's financial strength rating.

136.    Lincoln New York increased its risk-based capital ratio as a result of its direct use of affiliated reinsurance transactions backed by an undisclosed "contractual parental guarantee."  Lincoln New York, in turn, reported this artificially inflated risk-based capital ratio to ratings agencies, which ultimately artificially elevated its financial strength rating.

137.    Lincoln New York provided no disclosure of its direct use of parental guarantees in its statutory annual statement, its consolidated annual report, or its SEC filings.

**Lincoln New York's Misrepresentations and Non-Disclosure**

138.    Insurance companies disclose risk-based capital information in their statutory annual statements filed with insurance regulators and, in some cases, 10-K reports filed with the United States Securities and Exchange Commission.  They also discuss risk-based capital information at their annual investor days and on their public earnings calls.  Moreover, regulators and rating agencies consider risk-based capital information as they determine a company's financial strength rating.

139.    Because the risk-based capital ratio is a measure of the financial strength of an insurer, artificial boosts to a company's risk-based capital ratio materially affect consumers and their life insurance beneficiaries, and the life insurance market more generally.

140.   Lincoln New York knowingly failed to adequately disclose its use of Two-Step Transactions with Lincoln National in Lincoln New York's statutory annual statements provided to state regulators, its SEC filings, or its consolidated annual report.

141.   Lincoln New York knowingly failed to adequately disclose the Conditional LOCs used by Lincoln National in Lincoln New York's statutory annual statements provided to state regulators, its SEC filings, or its consolidated annual report.

142.   Lincoln New York knowingly failed to adequately disclose that certain company-affiliated captive reinsurers counted Conditional LOCs backed by parental guarantees as admitted assets on the captive's balance sheet in Lincoln New York's statutory annual statements provided to state regulators, its SEC filings, or its consolidated annual report.

143.   Lincoln New York knowingly failed to adequately disclose its direct shadow insurance transactions with company-affiliated captive reinsurers that were collateralized using "contractual parental guarantees" in its statutory annual statements provided to state regulators, its SEC filings, or its consolidated annual report.

144.   Lincoln New York's failure to disclose its shadow insurance practices constituted a misrepresentation of its financial condition and its reserve system.

145.   Indeed, the New York Insurance Regulations explain that reinsurance arrangements that do not actually transfer all the significant risks of the insurance policies being reinsured have the effect of "distorting [the ceding insurer's] financial statements and not properly reflecting its financial condition."  N.Y. Comp. Codes. R. & Regs. tit. 11, § 127.0(c)(2).

146.    Lincoln New York's failure to disclose its shadow insurance practices misled its regulator and consumers, like Plaintiff and members of the Class and their representatives, about Lincoln New York's financial condition and its reserve system.

147.    Lincoln New York's failure to disclose its shadow insurance practices caused Lincoln New York's financial ratings to be artificially inflated, which in turn caused consumers and their representatives, like Plaintiff and members of the Class, to pay more for life insurance than they would have if Lincoln New York had provided accurate information about its risk-based capital ratio, its financial condition, and its reserve system.

148.    Lincoln New York's failure to disclose its shadow insurance practices caused Lincoln New York's financial ratings to be artificially inflated, which in turn caused consumers and their representatives, like Plaintiff and members of the Class, to purchase life insurance from a company that was less financially sound than Lincoln New York represented.

## Class Action Allegations

149.    Plaintiff brings this action on behalf of himself and all others similarly situated as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

150.    Plaintiff proposes a Class defined as:

All persons and entities who, directly or indirectly, purchased, renewed, or paid premiums on life insurance policies issued by Lincoln New York in the six years prior to the filing of this Complaint.

Excluded from the class are past or present officers, directors, agents, brokers, or employees of Lincoln New York, or its parents or subsidiaries; any agents, brokers, or others who sold policies for Lincoln New York, or its parents or subsidiaries; any entity in which Lincoln New York has a controlling interest; the affiliates, legal

representatives, attorneys or assigns of Lincoln New York, or its parents or subsidiaries; any judge, justice, or judicial officers presiding over this matter and the staff and immediate family of any such judge, justice, or judicial officer.  Also excluded are the estates of any deceased that have been paid benefits under policies purchased during the class period.

151.   **Class Identity:**  The members of this Class are readily identifiable as Lincoln New York policyholders and can be identified and located by Lincoln New York's own records.

152.   **Numerosity:**  The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court.  The exact number of Class members is unknown to Plaintiff at this time, but can be ascertained through appropriate discovery, since members of the proposed Class will be identified from records maintained by Lincoln New York.  The Class is believed to have thousands of members.

153.   **Typicality:**  Plaintiff's claims are typical of those of the Class members, and the relief sought is typical of the relief which would be sought by each Class member in separate actions.  Plaintiff's claims are based on the same legal theory as the claims of the other Class members and are based on the same misleading representations, misrepresentations, and omissions made by Lincoln New York regarding Lincoln New York's financial condition and the reserves backing the financial risk undertaken by Lincoln New York.  Plaintiff and Class members are similarly aggrieved within the meaning of New York Insurance Law Section 4226(d) as a result of Lincoln New York's company-wide accounting and financial reporting practices.

154.  **Adequacy:**  Plaintiff will fairly and adequately protect the interests of the Class members.  Plaintiff and the other Class Members are aggrieved persons under New York Insurance Law Section 4226.  Plaintiff purchased a policy subject to the same misleading representations, misrepresentations, and omissions made by Lincoln New York regarding its financial condition, reserve system, and available reserves, as the other Class Members and Plaintiff has no interests that are antagonistic or adverse to the interests of Class members.  Plaintiff has retained counsel competent and experienced in insurance law, reinsurance law and class action and mass action litigation and who have been appointed by numerous courts to lead class actions and complex litigation.

155.  **Commonality:**  Common questions of law and fact exist as to all Class members and predominate over any possible questions that might affect only individual Class members.  Among the questions of law and fact common to the proposed Class are:

a)    Whether Lincoln New York failed to adequately disclose its Two-Step Transactions with Lincoln National, the Conditional LOCs used by Lincoln National, and that certain company-affiliated captive reinsurers recorded Conditional LOCs backed by parental guarantees as admitted assets on the captive's balance sheet;

b)    Whether Lincoln New York improperly increased its apparent financial strength through its use of Two-Step Transactions;

c)    Whether Lincoln New York failed to adequately disclose the contractual parental guarantees backing LOCs issued as collateral for affiliated reinsurance transactions;

d)    Whether Lincoln New York artificially increased its reported risk-based capital ratio as a result of its direct use of contractual parental guarantees backing affiliated reinsurance transactions; and

e)    Whether Lincoln New York's shadow insurance practices, as alleged herein, violate New York Insurance Law Section 4226.

156.   **Superiority:**   A class action is superior to any other possible method for the fair and efficient adjudication of the controversy for several reasons:

a)   Class action treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions would engender.

b)   Class members have little interest in individually controlling the prosecution of separate actions.   The substantial fees and costs required to challenge Lincoln New York's wrongful conduct greatly exceed the penalty available to any individual Class member under New York Insurance Law Section 4226(d) and it would not be feasible or desirable for individual Class members to prosecute separate actions against Lincoln New York.

c)   There are no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.   On the contrary, the expense and burden of litigation would make it difficult or impossible for individual Class members to maintain individual actions.   Moreover, even if such individual litigation were practicable, the cost to the court system of adjudication of individual litigation would be substantial.   This action will result in an orderly and expeditious administration of Class claims.   Economies of time, efforts, and expense will be fostered, and uniformity of decisions will be ensured.   In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

## COUNT I:  MISREPRESENTATION IN VIOLATION OF NEW YORK INSURANCE LAW, SECTION 4226

157.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

158.   New York Insurance Law Section 4226(a) imposes liability on any insurer that misrepresents its financial condition or the capital reserve system that it maintains to protect itself against the risk of financial loss.   N.Y. Ins. Law § 4226(a)(4) ("No insurer authorized to

do in this state the business of life, or accident and health insurance, or to make annuity contracts shall: . . . (4) make any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates.").

159.    As set forth in this complaint, Lincoln New York knowingly withheld from regulators and the public its "shadow insurance" practices, artificially inflating its risk-based capital ratio, and thereby misrepresenting the true extent of its exposure to the risk of financial loss, its financial condition, and the legal reserve system upon which it operates.

160.    As set forth in this complaint, Lincoln New York knowingly violated N.Y. Ins. Law § 4226(d) and knowingly received premiums and other compensation in consequence of such violation.

161.    Although New York Insurance Law Section 4226 does not require that a purchaser of an insurance policy sustain or claim to have sustained damage or injury to bring a claim under that section, Plaintiff and members of the Class have paid premiums for life insurance policies that are less financially secure than Lincoln New York represented them to be.  Plaintiff and members of the Class have also paid inflated premiums for life insurance policies as a direct result of Lincoln New York's conduct described in this complaint. Plaintiff and members of the Class have therefore been damaged and aggrieved by Lincoln New York's misrepresentations, and misleading representations, concerning its financial condition and the reserves backing the financial risk undertaken by Lincoln New York.

162.    As a consequence and direct result of Lincoln New York's misleading representations and misrepresentations about its financial condition and its legal reserve

system upon which it operates, Plaintiff and members of the Class are entitled to recover, as a statutory penalty, the premiums they have paid for their life insurance policies.  N.Y. Ins. Law § 4226(d) ("Any such insurer that knowingly violates any provision of this section, or knowingly receives any premium or other compensation in consequence of such violation shall, in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit, in accordance with the provisions of the civil practice law and rules.").

### Prayer for Relief

WHEREFORE, Plaintiff prays for relief and judgment against Lincoln New York as follows:

(a)     Determining that this action is a proper class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Appointing Plaintiff as the lead representative of the Class and appointing his counsel lead counsel for the Class;

(c)     Awarding a penalty in the amount of all premiums paid by Plaintiff and members of the Class to Lincoln New York for life insurance policies that were in effect during the Class Period;

(d)     Awarding such other relief as the Court may deem just and proper.

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.

Dated:  March 25, 2015

Respectfully submitted,

s/ Patrick F. Madden
Patrick F. Madden (Bar No. 029642010)
pmadden@bm.net
Shanon J. Carson*
scarson@bm.net
Glen Abramson*
gabramson@bm.net
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-4656
Fax: (215) 875-4604

John S. Skilton*
JSkilton@perkinscoie.com
David J. Harth*
DHarth@perkinscoie.com
Timothy W. Burns*
TBurns@perkinscoie.com
Jeff J. Bowen*
JBowen@perkinscoie.com
Freya K. Bowen*
FBowen@perkinscoie.com
Rhett P. Martin*
RMartin@perkinscoie.com
Jesse J. Bair*
JBair@perkinscoie.com
**PERKINS COIE LLP**
One East Main Street, Suite 201
Madison, WI  53703
Tel:     (608) 663-7460
Fax:     (608) 663-7499

Shawn M. Raiter*
sraiter@larsonking.com
**LARSON • KING LLP**
30 East Seventh Street, Suite 2800
Saint Paul, MN  55101
Tel:     (651) 312-6518
Fax:     (651) 312-6618

William R. Scherer, Jr.*
wscherer@conradscherer.com
Albert F. Frevola, Jr.*
afrevola@conradscherer.com
**CONRAD & SCHERER LLP**
633 South Federal Highway, 8th Floor
Fort Lauderdale, FL 33301
Tel:   (954) 462-5500
Fax:   (954) 463-9244

Kai H. Richter*
krichter@nka.com
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel:   (612) 256-3278
Fax:   (612) 215-6870

*Pro hac vice motions forthcoming*

*Attorneys for Plaintiff and Putative Class*